**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **M.B.,** *A MINOR,* | : | |
| *Plaintiff,* | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **SCHUYLKILL COUNTY et al.,** | : | **No. 18-756** |
| *Defendants.* | : | |

## <u>M E M O R A N D U M</u>

PRATTER, J.                                                        MARCH 21, 2019

 This case involves alarming facts.  The Court's immediate task, however, is not to evaluate the seriousness of the allegations, but rather to test their sufficiency.  As set forth below, the Court grants in some parts and denies in other parts the various defendants' motions to dismiss.[1]

 The Schuylkill County Defendants move to dismiss all § 1983 claims against them as well as the prayer for punitive damages against Marcia Hoke.  The Court grants in part and denies in part the motion, such that it will grant the request to dismiss the punitive damages claim against Ms. Hoke in her official capacity only.

---

[1] The defendants in this case fall into three categories:

(1) The "Schuylkill County Defendants," including Schuylkill County and Marcia Hoke;

(2) The "KidsPeace Defendants," including

  (a) KidsPeace, KidsPeace National Centers, Inc., KidsPeace Corporation (collectively, the "Organizational KidsPeace Defendants"), and

  (b) Kelsey O'Hara, Heather Moore, and Cori Ruszkowski (collectively, the "Individual KidsPeace Defendants"); and

(3) The "CSS Defendants," including Catholic Social Services of the Diocese of Scranton, Inc. and Geneva Mathuse.

The CSS Defendants move to dismiss the § 1983 claims and negligence and vicarious liability claims against them. The Court grants the motion, and all claims against the CSS Defendants are therefore dismissed.

The KidsPeace Defendants move to dismiss the § 1983 claims, negligent misrepresentation claims, and negligence *per se* claims against them. The Court grants in part and denies in part the motion, such that the § 1983 claims are dismissed against all of the KidsPeace Defendants.

**BACKGROUND**[2]

Plaintiff M.B. is a developmentally and emotionally disabled child. Since September 15, 2014, M.B. and her biological brother have been in the custody and care of K.B. and P.B. K.B. and P.B. formally adopted M.B. and her brother on February 1, 2017, and K.B. and P.B. have been the legal parents and guardians of both children since that time.

## I. K.B. and P.B. Foster J.W.

In May 2017, K.B. and P.B. registered as foster parents with KidsPeace, a Pennsylvania-based foster care organization. Shortly thereafter, KidsPeace employee Cori Ruszkowski contacted K.B. and P.B. about potentially placing an 11-year-old boy, J.W., in K.B. and P.B.'s care. At that time, J.W. was in the custody of Schuylkill County Children & Youth Services ("SCCYS"), which is an agency of Schuylkill County. Although K.B. and P.B. "were not looking to foster a child of [J.W.'s] age," Ms. Ruszkowski assured K.B. and P.B. that "J.W. acted younger than his biological age and that he posed no risk, sexual or otherwise, to [K.B. and P.B.'s] minor children," including M.B. Amended Compl. ¶ 33. At least one employee from SCCYS would later echo that sentiment.

---

[2]     This background description comes from the allegations made in the Amended Complaint.

On or around May 18, 2017, K.B. and P.B. spoke with Ms. Ruszkowski about J.W.'s history. Ms. Ruszkowski reaffirmed that J.W. did not have a history of sexual abuse, molestation, or past behavioral issues that might cause problems at K.B. and P.B.'s home. K.B. and P.B. were only told that J.W. had one "minor incident" in his prior home, in which he "turned over a table." *Id.* ¶ 35.

On or around May 22, 2017, K.B. and P.B. met with J.W. for the first time, at Lehigh Valley Hospital. The meeting and a medical exam did not raise any red flags with K.B. and P.B., and so they agreed to foster J.W. After that meeting, Ms. Ruszkowski text messaged K.B. that J.W. had "been through the ringer," *id.* ¶ 36, but did not explain what she meant by that.

A few days later, on or around May 25, 2017, Ms. Ruszkowski and Marcia Hoke—a case worker at SCCYS—"transported [J.W.] for placement" in K.B. and P.B.'s home. *Id.* ¶ 37. At that time, "K.B. inquired again to Defendants Hoke and Ruszkowski whether J.W. had ever been molested, had a sexual assault history with others or had other troubling or concerning behaviors." *Id.* Ms. Ruszkowski and Ms. Hoke each "categorically denied that J.W. had any sexual assault, molestation or troubling behavioral history or that he posed a risk to [M.B.] or her family." *Id.*

At the time of J.W.'s placement, K.B. and P.B. requested, but did not receive, (1) a copy of J.W.'s "background materials," and (2) a family service plan. *Id.* ¶ 38. K.B. and P.B. appear to have been entitled to several categories of information about J.W.:

> ➤ First, upon their request, K.B. and P.B. were entitled to whatever records were maintained for J.W. 55 Pa. Code § 3680.35(b)(i).

> ➤ Second, K.B. and P.B. should have been provided information, from J.W.'s case records, necessary to (1) "protect [J.W.'s] health and safety and to assist in [J.W.'s] successful accomplishment of necessary educational, developmental or remedial tasks," and (2) "enable [J.W.] to function safely[.]" 55 Pa. Code § 3700.38(c)–(d).

➢ Third, within sixty days of accepting a foster family, the relevant county agency was required to prepare and provide the foster parents with a family service plan identifying (1) information pertaining to both the child and other family members, (2) the specific circumstances under which the case was accepted, (3) the service objectives for the family and changes needed to protect children in the family from abuse, neglect, and exploitation, (4) the services to be provided to achieve the plan's objectives, (5) the actions to be taken by the parents, children, the county agency or other agencies, (6) any placement amendments, and (7) the results of family service plan reviews and placement reviews. 55 Pa. Code § 3130.61. Further, prior to placement of a foster child, the foster parents should have received amendments to the service plan identifying, among other things, the foster child's "known medical problems, including the identification of known physical, mental or emotional disabilities." 55 Pa. Code § 3130.67(b)(2)(vi).

## II. K.B. and P.B. Begin to Have Issues with J.W. and Learn of Previous Incidents.

While K.B. and P.B. were fostering J.W., several incidents with him occurred:

➢ On or around May 26, 2017, J.W. informed his foster parents that he had previously been abused. After K.B. alerted Ms. Ruszkowski at KidsPeace, Ms. Ruszkowski responded that K.B. should "hold off calling it in" to Child Protective Services. Amended Compl. ¶ 42. Ms. Ruszkowski then followed up with K.B. that the allegation was already in CPS's system and that the allegation "has been investigated." *Id.* SCCYS and Ms. Hoke also allegedly knew about the prior accusation of abuse, but no one from SCCYS or KidsPeace initially disclosed the existence of the allegation to either K.B. or P.B.

➢ On or around May 30, 2017, J.W. told K.B. and P.B. that he was nervous about an upcoming routine psychological evaluation because he had been forced to leave his previous foster home after another boy tried to kiss him. K.B. and P.B. responded by alerting Ms. Hoke at SCCYS, who "laughed" and said that J.W. had "asked the boy to kiss him." *Id. ¶* 43. Ms. Hoke also added that when J.W. was asked about this episode at his prior foster home, it caused J.W. to flip a table and attempt to jump out of a window. Though K.B. and P.B. knew that J.W. had flipped a table, SCCYS had not previously disclosed the incident's cause, nor did SCCYS tell K.B. and P.B. that J.W. had tried to jump out of a window. No one had previously told the foster parents that J.W. had an incident involving kissing another foster child.

➢ Also on or around May 30, 2017, Ms. Ruszkowski at KidsPeace informed K.B. and P.B. that J.W.'s file described another previously undisclosed incident, during which J.W. asked another boy to have sex with him. The file stated that this was

assessed to be an "isolated incident" and a "non-threat." *Id.* ¶ 44. This incident was not previously disclosed to K.B. and P.B.

➢ On or around June 5, 2017, a different KidsPeace employee—Kelsey O'Hara—informed K.B. and P.B. that J.W. was not allowed to be placed in a home with his biological brothers after an undisclosed incident. According to Ms. O'Hara, J.W. had a "not healthy" relationship with his brothers, whom he "manipulated" by telling them to "do bad things." *Id.* ¶ 45. K.B. and P.B. did not know about this incident before being told by Ms. O'Hara, and they asked Ms. O'Hara for J.W.'s psychological evaluation. They never received the evaluation, however.

➢ On or around June 11, 2017, J.W. told K.B. and P.B. that he had been molested by a former foster mother.

➢ On or around June 15, 2017, Geneva Mathuse, a Corporate Social Responsibility Worker for Catholic Social Services of the Diocese of Scranton, Inc. ("CSS"), visited K.B. and P.B.'s home to meet with J.W. CSS was responsible for finding a permanent adoptive home for J.W. Ms. Mathuse told K.B. and P.B. that she was surprised that J.W. had been placed in that home because J.W. "was not to be placed in homes with younger children." *Id.* ¶ 47. At least one of KidsPeace's offices (in Reading) allegedly also had this information, although the office that was responsible for placing J.W. with K.B. and P.B. (the Doylestown office) did not have the information.

➢ Also on or around June 15, 2017, J.W. attempted to kiss P.B. on the mouth. The next day, K.B. contacted Ms. O'Hara at KidsPeace about the incident, who advised K.B. to discuss boundaries with J.W.

Neither KidsPeace, SCCYS, CSS, nor any of their employees, took action to remove J.W. from K.B.'s and P.B.'s custody after these incidents or in light of the subsequent disclosures.

## III. The Alleged Sexual Assault

On or around June 16, 2017, during a family meeting, M.B. indicated that she had seen J.W. naked in her bedroom. M.B. then privately described to K.B. the assault, including that J.W. had walked into M.B.'s room while naked, stripped off M.B.'s clothing, and sexually assaulted

M.B.[3]  M.B. also told her parents that at another point, J.W. attempted to sexually assault her with a toy car.  Immediately after M.B. told her parents about these incidents, K.B. called KidsPeace's emergency phone line to have J.W. removed from the home.

## LEGAL STANDARD

A motion to dismiss tests the sufficiency of a complaint.  Although Rule 8 of the Federal Rules of Civil Procedure requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), "to 'give the defendant fair notice of what the claim is and the grounds upon which it rests,'" the plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations and alteration omitted).

To survive a motion to dismiss, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Specifically, "[f]actual allegations must be enough

---

[3]    According to the Amended Complaint, M.B. described the assault as follows:

 a. On or about the evening of June 15, 2017 and possibly into the early hours of June 16, 2017, J.W. entered Minor-Plaintiff, M.B.'s, bedroom naked and removed her clothing;

 b. J.W. then proceeded to lay on top of Minor-Plaintiff, M.B., with his private parts resting against hers;

 c. J.W. then put his hands and mouth both on and in Minor-Plaintiff, M.B.'s, vagina;

 d. Minor-Plaintiff, M.B., tried to scream but J.W. covered her mouth with his hand and pinched her until she stopped trying to yell;

 e. J.W. told Minor-Plaintiff, M.B., that she would be in trouble if she yelled or told anyone; [and]

 f. J.W. then got Minor-Plaintiff, M.B., to touch his penis while trying to kiss her and stick his tongue in her mouth.  M.B. told her mom that she had to keep her eyes closed as she was so scared and is not supposed to see others naked . . . .

Amended Compl. ¶ 52.

to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The question is not whether the plaintiff "will ultimately prevail . . . but whether [the] complaint [is] sufficient to cross the federal court's threshold." *Skinner v. Switzer*, 562 U.S. 521, 530 (2011) (citation and quotation omitted). Thus, assessing the sufficiency of a complaint is "a context-dependent exercise" because "[s]ome claims require more factual explication than others to state a plausible claim for relief." *W. Pa. Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 98 (3d Cir. 2010) (citations omitted).

In evaluating the sufficiency of a complaint, the Court adheres to certain accepted benchmarks. For one, the Court "must consider only those facts alleged in the complaint and accept all of the allegations as true." *ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 (3d Cir. 1994) (citation omitted); *see also Twombly*, 550 U.S. at 555 (stating that courts must "assum[e] that all the allegations in the complaint are true (even if doubtful in fact)"). The Court must accept as true all reasonable inferences emanating from the allegations and view those facts and inferences in the light most favorable to the nonmoving party. *Rocks v. City of Phila.*, 868 F.2d 644, 645 (3d Cir. 1989).

That admonition does not demand that the Court ignore or discount reality. The Court "need not accept as true unsupported conclusions and unwarranted inferences," *Doug Grant, Inc. v. Greate Bay Casino Corp.*, 232 F.3d 173, 183–84 (3d Cir. 2000) (citations and quotation omitted), and "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citation omitted). If a claim "is vulnerable to 12(b)(6) dismissal, a district court must permit a curative

amendment, unless an amendment would be inequitable or futile." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 236 (3d Cir. 2008) (citation omitted).

M.B. brings claims, sounding in both state and federal law, against three groups of defendants: (1) the Schuylkill County Defendants, (2) the KidsPeace Defendants, and (3) the CSS Defendants. The Court addresses the defendants' motions to dismiss in five parts.

First, the Court determines that the Amended Complaint is not an improper "shotgun pleading," although it does possess some of the qualities that make shotgun pleadings objectionable.

Second, the Court analyzes the § 1983 claims alleged against the three sets of defendants. As to the Schuylkill County Defendants' arguments, the Court determines that M.B. (1) adequately pleads an individual liability state-created danger claim against Marcia Hoke, and (2) adequately pleads an organizational liability *Monell* claim against Schuylkill County. As to the CSS Defendants' and KidsPeace Defendants' arguments, the Court agrees that neither was acting under color of state law and therefore M.B. does not adequately allege § 1983 claims against the CSS Defendants or the KidsPeace Defendants.

Third, the Court analyzes the negligence and vicarious liability claims against the CSS Defendants. The Court determines that although the CSS Defendants owed a general duty of care to M.B., the Amended Complaint does not contain any allegations of misfeasance by the CSS Defendants, and so the negligence and vicarious liability claims cannot proceed against the CSS Defendants.

Fourth, the Court analyzes the KidsPeace Defendants' argument that the Amended Complaint does not state a claim for negligent misrepresentation. The Court acknowledges that

M.B. does not make any allegation of reliance by M.B., but nonetheless holds that, as set forth in the Restatement (Second) of Torts, the reliance of one party—here M.B.'s parents—can be imputed to a third party—here M.B.—to satisfy the reliance element of negligent misrepresentation. Consequently, the Court will not dismiss the negligent misrepresentation claim against the KidsPeace Defendants.

Fifth and finally, the Court analyzes the KidsPeace Defendants' request to dismiss the negligence *per se* claims. The Court will not dismiss these claims, because the purpose of the relevant administrative laws was, at least in part, to protect foster families—and not just foster children.

## I. Whether the Amended Complaint Is a Shotgun Pleading

The KidsPeace Defendants and CSS Defendants argue that the Amended Complaint is a "shotgun pleading."[4] The Third Circuit Court of Appeals has criticized "the all too common shotgun pleading approach" to complaints. *Hynson v. City of Chester Legal Dep't*, 864 F.2d 1026, 1031 n.13 (3d Cir. 1988)); *see also Opdycke v. Stout*, 233 F. App'x 125, 127 (3d Cir. 2007) (a "shotgun complaint usually creates a task that can be quite onerous for courts[.]") (citation and quotations omitted). The Court has described four types of shotgun pleadings:

> (1) [A] complaint containing multiple counts where each count adopts the allegations of all preceding counts; (2) a complaint that is replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action; (3) a complaint that does not separate into a different count each cause of action or claim for relief; and (4) a complaint that asserts multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against.

---

[4] Although only the KidsPeace Defendants and CSS Defendants make this argument, this purported infirmity would potentially require dismissal of all claims of a "shotgun" variety.

*Bartol v. Barrowclough*, 251 F. Supp. 3d 855, 859 (E.D. Pa. 2017) (citation and quotations omitted). The "unifying characteristic" of these four categories of shotgun pleadings "is that they fail to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Id.* In *Bartol*, the Court dismissed a complaint that "fail[ed] to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests" because the complaint was "a shotgun pleading that fail[ed] to comply with Rule 8(a)(2)." *Id.* at 860 (citation and quotations omitted).

Here, although the defendants are correct that the Amended Complaint has some of the characteristics of a shotgun pleading, the Court will not dismiss the action in its entirety based on the defendants' assertion that (1) each counts adopts the allegations of the preceding counts, and (2) some of the causes of action do not identify the "role of each particular defendant in the claim." Doc. No. 48-1 at pp. 7–8. The Amended Complaint describes, in significant detail, specific allegations against the respective defendants. *See* Amended Compl. ¶¶ 26–56 ("**FACTUAL BACKGROUND**" section). Unlike the complaint in *Bartol*, M.B.'s Amended Complaint "give[s] the defendants adequate notice of the claims against them and the grounds upon which each claim rests." 251 F. Supp. 3d at 860 (citation and quotation omitted).[5]

---

[5] The Court is also cognizant that though the underlying "**FACTUAL BACKGROUND**" section of the Amended Complaint includes specific allegations and clearly identifies the individual defendants to whom they apply, *see* Amended Compl. ¶¶ 26–56, the allegations in each "**COUNT**" do not reliably make the same distinction, in some instances grouping together general allegations against different categories of defendants. *See, e.g.*, *id.* ¶¶ 57–77 (Count I – allegations generally against all of the KidsPeace Defendants and all of the Schuylkill County Defendants); *id.* ¶¶ 78–96 (Count II – allegations generally against all of the CSS Defendants); *id.* ¶¶ 97–101 (Count III – allegations against generally the KidsPeace Defendants and the CSS Defendants). To the extent the defendants argue that any count lacks specific factual support, and is instead based entirely on general "labels," "conclusions," or "formulaic recitation of the elements of a cause of action," *Twombly*, 550 U.S. at 555, the Court will address the sufficiency (or insufficiency) of those counts as needed.

## II.     Whether the Amended Complaint States Claims under § 1983

In this case, the § 1983 claims against individuals seek recovery for a state-created danger. "As a general matter, . . . a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *DeShaney v. Winnebago Cnty. Dep't of Social Servs.*, 489 U.S. 189, 197 (1989). State-created danger claims are a narrow exception to that general rule. *See Bright v. Westmoreland Cty.*, 443 F.3d 276, 281 (3d Cir. 2006). To prevail on a state-created danger theory, the plaintiff must prove the following four elements:

> 1) the harm ultimately caused was foreseeable and fairly direct;
>
> 2) a state actor acted with a degree of culpability that shocks the conscience;
>
> 3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and
>
> 4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

*Id.* (citations, quotations, and footnotes omitted).

Organizational defendants, however, "cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 691 (1978). Instead, the "touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution." *Id.* at 690.

There are two primary types of *Monell* liability. First, local governments may be sued "for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Id.* at 690–91. "[I]t is when execution of a government's policy or custom, whether made by its

lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694.

Second, claims "alleging that [a municipality's] failure to provide training to municipal employees resulted in the constitutional deprivation she suffered" are also cognizable under § 1983. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 392 (1989). "Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as [a municipality's] 'policy or custom' that is actionable under § 1983." *Id.* at 389.

### A. § 1983 Claims Against the Schuylkill County Defendants

M.B. advances § 1983 claims against both the individual and organizational Schuylkill County Defendants. She asserts a claim against Marcia Hoke under a state-created danger theory and a *Monell* claim against Schuylkill County under a failure to train theory.

#### 1. Whether Marcia Hoke Is Liable for a State-Created Danger Claim

M.B. alleges that SCCYS employee Marcia Hoke is liable under a § 1983 state-created danger theory.[6] The Court will address each element required to establish a state-created danger claim.

##### i. Whether the Harm Ultimately Caused Was Foreseeable and Fairly Direct

M.B. adequately alleges the existence of a fairly direct foreseeable harm. To establish that a harm was foreseeable, a plaintiff must "only 'allege an awareness on the part of the state actors

---

[6]    In her position at SCCYS as a caseworker, Ms. Hoke allegedly is responsible for "ensur[ing] that the placement of foster children in a foster home was safe for the foster children and, just as importantly, safe and suitable for the family accepting the foster child placement." Amended Compl. ¶ 14. She is also allegedly "responsible for working with foster families following placement of a child into their residences." *Id.*

that rises to the level of actual knowledge *or an awareness of risk* that is sufficiently concrete to put the actors on notice of the harm." *L.R. v. Sch. Dist. of Philadelphia*, 836 F.3d 235, 245 (3d Cir. 2016) (emphasis in original) (quoting *Phillips*, 515 F.3d at 238). In *L.R.*, the plaintiff satisfied this requirement by alleging that the defendant school district released a pupil to an unverified adult. *Id.* The Court held that "the risk of harm in releasing a five-year-old child to a complete stranger was obvious." *Id.*

Here, M.B. has alleged facts sufficient to demonstrate an awareness of risk by Ms. Hoke. According to M.B., Ms. Hoke played an active role in placing J.W. in P.B. and K.B.'s home in at least two ways. First, Ms. Hoke was present when P.B. and K.B. took custody of J.W. Amended Compl. ¶ 37. Second, Ms. Hoke "categorically denied that J.W. had any sexual assault, molestation or troubling behavioral history *or that he posed a risk to [M.B.] or her family*" after the parents asked Ms. Hoke "whether J.W. had ever been molested, had a sexual assault history with others or had other troubling or concerning behaviors." *Id.* (emphasis added). But based on the allegations in the Amended Complaint, Ms. Hoke must also have been aware that there was a risk that J.W. would act out sexually towards other children. According to the Amended Complaint, Ms. Hoke knew that (1) J.W. reported previously being abused, *id.* ¶ 42, and (2) J.W. had previously tried to kiss a boy in his last foster home. *Id.* ¶ 43.[7]

Consequently, M.B. alleges that Ms. Hoke knew both that P.B. and K.B. had young children in their home and also knew that J.W. had previously acted out towards other young

---

[7]     The Amended Complaint also alleges that J.W.'s file indicated that J.W. had asked a boy at his prior foster home to have sex with him. Amended Compl. ¶ 44. Although the Amended Complaint is silent as to whether this is the same file that Ms. Hoke and the Schuylkill County Defendants had in their possession, M.B. alleges that this information "would have been part of" the materials Schuylkill County was required by law to maintain. *Id.*; *see also id.* ¶ 41.

children.  As such, "the risk of harm" in placing J.W. in a home with two other young children "was obvious."  *L.R.*, 836 F.3d at 245.

M.B. adequately alleges the first element of a state-created danger claim against Ms. Hoke.

ii.    Whether Ms. Hoke Acted with the Required Culpability

Ms. Hoke's actions, as alleged in the Amended Complaint, also evince the requisite degree of culpability.

> The level of culpability required for behavior to shock the conscience largely depends on the context in which the action takes place.  In a 'hyperpressurized environment,' such as a high-speed police chase, intent to harm is required.  But in situations where deliberation is possible and officials have the time to make 'unhurried judgments,' deliberate indifference is sufficient.

*Id.* at 246 (citation, quotation, and footnotes omitted).  Here, drawing all inferences in favor of the allegations in the Amended Complaint, the officials placing J.W. should have been able to make "unhurried judgments" rather than acting in a "hyperpressurized environment."  *Id.*[8]  As a result, the allegations allow for a consideration that Ms. Hoke must have been deliberately indifferent to M.B.'s constitutional rights.

According to the Amended Complaint, Ms. Hoke not only knew that J.W. had inappropriate interactions with young children in the past and nevertheless assisted with placing J.W. in a home with other young children, but she also ignored or overlooked explicit concerns raised by K.B. and P.B. that they did not want to foster a child with any "sexual assault, molestation or troubling behavioral history."  Amended Compl. ¶ 37.  Consequently, the allegations against

---

[8]    At the time J.W. was placed in K.B. and P.B.'s care, J.W. was living at the Lehigh Valley Hospital.  Amended Compl. ¶ 35.  Prior to that, J.W. had been in a foster home, but was removed "because he had turned over a table[.]"  *Id.*  Nothing in the Amended Complaint supports an inference that there was or should have been any pressure to hurriedly remove J.W. from the hospital.

Ms. Hoke are adequate to demonstrate a "conscious disregard of a substantial risk of serious harm," in that she allegedly disregarded K.B. and P.B.'s concerns and did not heed J.W.'s history. *L.R.*, 836 F.3d at 246 (citation omitted). Just as "releasing a five-year-old child to an unidentified, unverified adult is 'so obvious' as to rise to the level of deliberate indifference," *id.*, so too was Ms. Hoke's alleged decision to participate in placing a child with a history of sexually inappropriate behavior towards other young children in a home with young children.

The Amended Complaint contains sufficient allegations of deliberate indifference by Ms. Hoke to plead a state-created danger claim.

### iii. Whether the Relationship Between M.B. and Ms. Hoke Made M.B. a Foreseeable Victim

The allegations also establish a sufficient relationship between Ms. Hoke and M.B. to render M.B. a foreseeable victim. The "relationship requirement" of state-created danger claims "'contemplates some contact such that the plaintiff was a foreseeable victim of the defendant's acts in a tort sense.'" *Phillips*, 515 F.3d at 242 (quoting *Morse v. Lower Merion School Dist.*, 132 F.3d 902, 908 (3d Cir. 1997)). "Such a relationship may exist where the plaintiff was a member of a discrete class of persons subjected to the potential harm brought about by the state's actions." *Id.* (citations omitted).

Here, M.B. was a member of a class of persons—children in K.B. and P.B.'s home—that was foreseeably at risk because of Ms. Hoke's alleged role in placing J.W. Ms. Hoke was present when J.W. was physically placed with K.B. and P.B., and Ms. Hoke also knew that K.B. and P.B. had children. Ms. Hoke had at least one pre-placement conversation with K.B. and P.B. about J.W. that specifically mentioned that K.B. and P.B. had other young children, and Ms. Hoke "categorically denied that J.W. had any sexual assault or molestation history or that he posed a risk to [K.B. and P.B.] *or their minor children*." Amended Compl. ¶ 37 (emphasis added). Further,

Ms. Hoke allegedly knew that (1) J.W. reported previously being abused, *id.* ¶ 42, and (2) J.W. had previously tried to kiss a boy in his last foster home. *Id.* ¶ 43.[9]

Because Ms. Hoke knew that K.B. and P.B. had children when she placed J.W. in the foster home, and because Ms. Hoke knew that J.W. had previously acted inappropriately towards other children, M.B. was a foreseeable victim.

### iv.   Whether Ms. Hoke Acted Affirmatively in Creating a Danger

The allegations also satisfy the fourth element of a state-created danger claim, by showing that Ms. Hoke engaged in affirmative acts to create a danger.  In *Bright v. Westmoreland County*, the Third Circuit Court of Appeals established that failure to use state authority—rather than affirmatively using state authority—does not violate the Due Process Clause.  443 F.3d at 282; s*ee also Morrow v. Balaski*, 719 F.3d 160, 177–79 (3d Cir. 2013), *as amended* (June 14, 2013) (defendant must have "created or enhanced a danger" and cannot "morph passive inaction into affirmative acts.").  In this case, however, the Amended Complaint establishes that at the time of J.W.'s placement, Ms. Hoke had at least one—and perhaps more than one—conversation with K.B. and P.B., during which Ms. Hoke stated unequivocally that J.W. was not a danger to other children.  *See* Amended Compl. ¶¶ 33, 35, 37.  In so doing, Ms. Hoke took affirmative action, *i.e.*, participated in actually dropping off J.W. at K.B. and P.B.'s home and reassured the parents that J.W. was not a risk to their other children.  *Id.* ¶ 37.  All the while, Ms. Hoke was allegedly aware of (and did not disclose) at least the following: (1) J.W. had alleged that he had previously been abused, *id.* ¶ 42, (2) J.W. had asked a boy in a previous foster home to kiss him, *id.* ¶ 43, and (3) when J.W. had flipped over a table in his previous foster home (which was disclosed), it was in

---

[9]     As noted above, *see supra* at n.7, J.W.'s file also indicated that he had asked another boy to have sex with him.

response to being asked about the kissing incident. *Id.* In other words, as alleged, Ms. Hoke did not merely refrain from telling K.B. and P.B. important information and she did more than fail to remove J.W. after placement. Instead, Ms. Hoke actively misled K.B. and P.B. during the placement process.

The allegations here are similar to the facts of *Bryan v. Erie Cty. Office of Children & Youth*, No. 03-259, 2009 WL 1360866 (W.D. Pa. May 14, 2009), in which the district court denied a motion to dismiss state-created danger claims. In *Bryan*, the plaintiffs alleged that a caseworker employed by the County "had knowledge that [the foster child] might hurt a child, because he had done so before." *Id.* at *2 (quotation omitted). The plaintiffs also alleged that the County caseworker "removed or approved the removal of statements . . . [from the] 'Child Health and Educational Data Form' . . . that indicated that [the foster child] was a threat, was sexually aggressive, [and] had harmed other children, before giving said written statements to the [plaintiffs]." *Id.* Lastly, the plaintiffs alleged that another County employee "knew that [the foster child] had sexually hurt a child but nevertheless approved of and assisted in placing [the child] in the Bryans['] home knowing there was a younger child in that home and then deliberately misrepresented [the foster child's] history to the Bryans." *Id.* Although the defendants in *Bryan* arguably had a more concrete basis for believing the foster child was dangerous, the facts in that case and M.B.'s allegations here both reflect that government officials create danger by disregarding risk factors while actively participating in the placement of foster children.

The Court will deny Ms. Hoke's request to dismiss the § 1983 claim against her.

### 2. Whether Ms. Hoke Is Entitled to Qualified Immunity

In addition to challenging the sufficiency of the state-created danger allegations against Ms. Hoke, the Schuylkill County Defendants argue that Ms. Hoke is insulated by qualified

immunity. In discussing qualified immunity, the Supreme Court has stated that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "To resolve a claim of qualified immunity, courts engage in a two-pronged inquiry: (1) whether the plaintiff sufficiently alleged the violation of a constitutional right, and (2) whether the right was 'clearly established' at the time of the official's conduct." *L.R.*, 836 F.3d at 241 (citation omitted).

Here, M.B. sufficiently pleads a violation of the Fourteenth Amendment under the state-created danger theory of liability. *See supra* at pp. 12–17. The question, therefore, is whether Ms. Hoke's alleged conduct violated clearly established law, i.e., "whether the state of the law when the offense occurred gave [Ms. Hoke] fair warning that [her] alleged treatment of [M.B.] was unconstitutional." *L.R.*, 836 F.3d at 247 (citation and quotation omitted).

The Schuylkill County Defendants argue that it was not clearly established that Ms. Hoke was prohibited from creating danger to "an individual victim who [wa]s never in the custody of the [S]tate." Doc. No. 45-2 at p. 41. But this is an "unduly narrow construction of the right at issue. . . . It has been clearly established in this Circuit for nearly two decades that a state-created danger violates due process." *Estate of Lagano v. Bergen Cty. Prosecutor's Office*, 769 F.3d 850, 859 (3d Cir. 2014) (citation omitted). And "'although earlier cases involving fundamentally similar facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding.'" *Id.* (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)); *see also L.R.* 836 F.3d at 249 ("Although there is no case that directly mirrors the

facts here, as in *Estate of Lagano*, there are sufficiently analogous cases that should have placed a reasonable official in [defendant's] position on notice that his actions were unlawful.").

Here, even within state-created danger caselaw, it was clearly established by 2017 that being deliberately indifferent to risks to children can subject state actors to liability. The Third Circuit Court of Appeals held in *L.R.* that the law clearly established that individuals have a "right to not be removed from a safe environment and placed into one in which it is clear that harm is likely to occur, particularly when the individual may, due to youth or other factors, be especially vulnerable to the risk of harm" 836 F.3d at 249; *see also Kedra v. Schroeter*, 876 F.3d 424, 440 (3d Cir. 2017), *cert. denied*, 138 S. Ct. 1990 (2018) (commenting that *L.R.* clearly established "an objective standard of deliberate indifference" in 2016). The *L.R.* court's survey of cases also establishes that state-created danger law is "not limited to circumstances in which [government] officers abandon private citizens in dangerous situations." 836 F.3d at 250. Instead, reasonable government officials must know that "'reckless, conscience shocking conduct that altered the status quo and placed a child at substantial risk of serious, immediate, and proximate harm [is] unconstitutional.'" *Id.* (quoting *Currier v. Doran*, 242 F.3d 905, 924 (10th Cir. 2001)). Additionally, this Court and other courts in this circuit have held that youth services employees can be liable for state-created dangers during placement of foster children. *See K.S.S. v. Montgomery Cty. Bd. Of Comm'rs*, 871 F. Supp. 2d 389, 403 (E.D. Pa. 2012); *Bryan*, 861 F. Supp. 2d. at 584.

Based on the foregoing, and in particular the Third Circuit Court of Appeals' searching analysis in *L.R.*, Ms. Hoke's conduct, as alleged, violated a clearly established constitutional right. First, Ms. Hoke had ample notice that her specific actions could endanger the children in K.B.'s and P.B.'s home, as the foster parents explicitly asked Ms. Hoke whether J.W. would pose a risk

to their other children. *See* Amended Compl. ¶¶ 33, 35, 37. Second, Ms. Hoke was present during and participated in the actual placement of J.W. in the same home as M.B. *Id.* ¶ 37. And third, K.B. and P.B. called Ms. Hoke, after J.W.'s placement, to discuss J.W.'s assertion that another foster child in a different home had previously tried to kiss him, *id.* ¶ 43, underscoring that Ms. Hoke had likely played a substantive role in placing J.W. As the Court of Appeals vividly observed, "if the state puts a person in a position of danger from private persons and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit." *L.R.*, 836 F.3d at 249 (citation and quotation omitted). It is of no moment here that M.B. is essentially claiming that Ms. Hoke allegedly threw the snake into the pit with M.B., rather than pushing M.B. into a pit fraught with danger. In either event, Ms. Hoke is not entitled to qualified immunity; the Amended Complaint alleges that Ms. Hoke acted with deliberate indifference in violating M.B.'s clearly established constitutional right to be free from state-created dangers.

### 3. Whether M.B. Can State a Claim Against Ms. Hoke for Punitive Damages

Finally, Ms. Hoke argues that the claim for punitive damages against all of the Schuylkill County Defendants, including Ms. Hoke, must be dismissed. The Amended Complaint explicitly excludes Schuylkill County from the prayer for punitive damages, *see* Amended Compl. p. 28,[10] and names Ms. Hoke as a defendant in her official *and* individual capacities. *Id.* ¶ 4. Punitive damages are not available against local officials in their official capacity, *see DeBellis v. Kulp*, 166 F. Supp. 2d 255, 281–82 (E.D. Pa. 2001), but they may be sought from state-official defendants in their individual capacities. *Id.* at 282. The Court will grant Ms. Hoke's request to dismiss the

---

[10]     Municipalities are immune from punitive damages under § 1983. *See City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981).

punitive damages claim against her in her official capacity but deny Ms. Hoke's request to dismiss the punitive damages claim against her in her individual capacity.

4.  Whether Schuylkill County Is Liable under *Monell*

M.B. also brings a § 1983 claim against organizational state-actor defendant Schuylkill County, under a failure to train theory. Although findings of failure to train liability are rare, the allegations in the Amended Complaint are sufficient to state a claim against Schuylkill County at this stage of the litigation.

Failure to train liability attaches only in "'limited circumstances,'" notably instances of a "deficient training 'program' necessarily intended to apply over time to multiple employees." *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 407 (1997) (quoting *City of Canton, Ohio*, 489 U.S. at 387, 390).[11] Nonetheless, the Supreme Court has not "foreclose[d] the possibility that evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, could trigger municipal liability." *Id.* at 409 (citing *City of Canton, Ohio*, 489 U.S. at 390 n.10); *see also Kane v. Chester Cty. Dep't of Children, Youth & Families*, 10 F. Supp. 3d 671, 688 (E.D. Pa. 2014) (plaintiff alleging single violation resulting from failure to train "must show that the need for the county to provide specific training in order to avoid constitutional injury was 'highly predictable' or 'patently obvious.'") (quoting *Connick v. Thompson*, 563 U.S. 51, 64 (2011)). "In essence, . . . this showing of 'obviousness' would demonstrate both that [the state] acted with conscious disregard for the consequences of [its]

---

[11]     Agencies' "continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the 'deliberate indifference'—necessary to trigger municipal liability." *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 407 (1997).

action," *i.e.*, with deliberate indifference, and "that the [state's] action directly caused [the plaintiff's] injuries, . . . thus substitut[ing] for the pattern of injuries ordinarily necessary to establish municipal culpability and causation." *Id.*

M.B. alleges that Schuylkill County failed to train its employees in several respects, including Schuylkill County's:

> ➢ "[f]ailure to train and supervise their employees and agents which allowed for the reckless and deliberately indifferent placement of J.W. in Minor-Plaintiff's home," Amended Compl. ¶ 67p;

> ➢ "[f]ailure to train and supervise their employees that the placement of foster children into foster families' homes should not be rushed," *id.* ¶ 67q;

> ➢ "[f]ailure to train and supervise their employees to place troubled foster children in alternative living arrangements such as one of Kidspeace's residential facilities," *id.* ¶ 67r; and

> ➢ "[f]ailure to train and supervise their employees to ensure that foster families must be provided with a prospective foster child's medical and general behavioral histories in accordance with Pennsylvania law," *id.* ¶ 67s.

For all of the allegations of failure to train, M.B. only points to a single instance in which Schuylkill County allegedly actively caused harm—Schuylkill County (via SCCYS) placing J.W. in a home with other young children, including M.B.  As such, M.B. must demonstrate that the Commonwealth's creation of danger was a "highly predictable" or "obvious[]" consequence of its failure to train its employees, presumably about foster placement.  *Bd. of Cty. Comm'rs of Bryan Cty., Okl.*, 520 U.S. at 409.

Two of this Court's decisions, each finding that the plaintiff adequately pleaded *Monell* claims under a "single violation" theory, are instructive.  First, in *Kane v. Chester Cty. Dep't of Children, Youth & Families*, the Court held that, in the context of an agency responsible for the placement of foster children, improper training of caseworkers dealing with sexual assault in foster

homes made it "highly predictable" that future harms would arise, because "[o]ccasions for caseworkers to deal with instances of sexual conduct are likely to recur in the course of caseworkers' duties[.]" 10 F. Supp. 3d. at 690. And second, in *L.R. v. School Dist. Of Philadelphia*, the Court held that "the [School] District and the Commission's failure to train and supervise its employees regarding its policies on release of pupils during the school day caused [a teacher's] unlawful release of [a student] to an unidentified adult," which was a "'highly predictable consequence' of [the] defendants' failure to provide training or supervision with respect to their release policies." 60 F. Supp. 3d 584, 600–01 (E.D. Pa. 2014), *aff'd*, 836 F.3d 235 (3d Cir. 2016).[12] The same logic applies with equal force in this case: improper training of employees responsible for foster placement made it "highly predictable" that future harms would arise because issues involving foster children and the children already living in prospective foster homes are "likely to recur" absent adequate screening. *Id.*; *Kane*, 10 F. Supp. 3d. at 690.

Further, as M.B.'s Amended Complaint shows, Pennsylvania's administrative disclosure requirements reflect the State's understanding that, absent certain disclosures by County agencies and foster care providers to foster parents, foster families could be put at risk. *See* Amended Compl. ¶ 38 (describing administrative disclosure obligations). Pennsylvania requires, for example, that foster parents receive "[a] record of the [foster] child's immunizations," 55 Pa. Code

---

[12]    In *City of Canton, Ohio v. Harris,* the Supreme Court suggested another hypothetical situation in which a single instance of insufficient training could suffice under *Monell*:

> [C]ity policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force can be said to be so obvious, that failure to do so could properly be characterized as deliberate indifference to constitutional rights.

489 U.S. 378, 390 n.10 (1989) (citation and quotations omitted).

§ 3130.67(b)(2)(v), and a record of "the [foster] child's known medical problems, including the identification of known physical, mental or emotional disabilities." 55 Pa. Code § 3130.67(b)(2)(vi). In both instances, the disclosures required by Pennsylvania arguably serve to protect not only the foster child but also foster families, ensuring that neither is put in a dangerous situation. *See* 55 Pa. Code § 3700.38(d) ("Foster families shall be provided information from the case record which will enable them to function safely . . . ."). Pennsylvania's regulatory scheme therefore underscores that policymakers "know to a moral certainty" that there are risks inherent in foster placement, *City of Canton, Ohio*, 489 U.S. at 390 n.10, but here Schuylkill County allegedly failed to train its employees on the administrative provisions addressing those acknowledged risks. *See* Amended Compl. ¶ 67s.

Because it was highly predictable that improper training of employees tasked with foster placement would result in injury to foster families, the allegations in the Amended Complaint are sufficient to state a claim for *Monell* liability against Schuylkill County. The Court will deny Schuylkill County's request to dismiss the *Monell* claim against it.

### B. § 1983 Claims Against the KidsPeace Defendants and CSS Defendants

The KidsPeace Defendants and the CSS Defendants argue that because they are private organizations (and the employees of those private organizations) rather than public entities, they cannot be held liable pursuant to § 1983.[13] It is axiomatic that, generally, § 1983 "requires that the plaintiff show that the defendant acted 'under color of law.'" *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 150 (1970) (citations omitted). There are limited circumstances, however, in which

---

[13] Both the KidsPeace Defendants and the CSS Defendants also argue that M.B. has not adequately alleged *Monell* liability against the organizational defendants. Because the Court determines that neither the KidsPeace Defendants nor the CSS Defendants were acting under color of state law, the Court does not address the alternative arguments made by either defendant.

private parties *can* be liable under § 1983 for acts committed under color of law. *See Brown v. Philip Morris Inc.*, 250 F.3d 789, 801 (3d Cir. 2001). To establish liability under such a theory, M.B. must show that the KidsPeace Defendants and CSS Defendants were effectively state actors under one of several tests: the "public function" test, the "close nexus" test, the "symbiotic relationship" test, and the "entwinement" test. *Id.* (describing public function test, close nexus test, and symbiotic relationship test); *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n,* 531 U.S. 288, 291 (2001) (describing entwinement test). Only the public function test is at issue,[14] and "[a]s the 'under color of state law' requirement is part of the prima facie case for § 1983, the plaintiff bears the burden of proof on that issue." *Groman v. Twp. of Manalapan*, 47 F.3d 628, 638 (3d Cir. 1995) (quoting *West v. Atkins*, 487 U.S. 42, 48 (1988)).

"The gravamen of the 'public function' test is whether the government is effectively using the private entity in question to avoid a constitutional obligation or to engage in activities reserved to the government." *Brown*, 250 F.3d at 801–02. The test therefore "asks whether the private entity has exercised powers that are traditionally the *exclusive* prerogative of the state," and courts "emphasize the 'exclusivity' aspect of the test." *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1142 (3d Cir. 1995) (emphasis in original, citation and quotation omitted); *see also Rendell-Baker v. Kohn*, 457 U.S. 830, 842 (1982) ("[T]he question is whether the function performed has been

---

[14]    The Amended Complaint does not contain allegations explicitly invoking any of the tests. Instead, M.B. argues in its oppositions to the KidsPeace Defendants' and CSS Defendants' motions to dismiss that the public function test is applicable because foster placement is a public function. *See*, *e.g.*, Doc. No. 51-1 at 14 ("Here, Minor-Plaintiff relies upon the public function test to establish that CSS was a state actor."); Doc. No. 52-1 at 16 ("Here, as in her prior response in opposition to the Kids[P]eace Defendants' Motion to Dismiss, Minor-Plaintiff relies upon the public function test to establish that Kids[P]eace was a state actor."). The Court will therefore analyze whether there are allegations in the Amended Complaint sufficient to establish that the KidsPeace Defendants and CSS Defendants were engaged in a public function. Because M.B. does not invoke the close nexus, symbiotic relationship, or entwinement tests, the Court expresses no opinion on whether M.B. could establish the elements of those tests.

traditionally the *exclusive* prerogative of the State.") (emphasis in original, citations and quotation omitted). In conducting this analysis, courts look to "[h]istorical practice, as well as the state statutory scheme[,]" *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 56 (1999), and the "requirements of the public function test are 'rigorous' and 'rarely satisfied.'" *Robert S. v. Stetson School, Inc.*, 256 F.3d 159, 165 (3d Cir. 2001) (quoting *Mark*, 51 F.3d at 1142).

The KidsPeace Defendants' and CSS Defendants' only alleged public function is that they engaged in foster placement. *See*, *e.g.*, Amended Compl. ¶ 15 (KidsPeace Defendants); *id.* ¶ 19 (CSS Defendants). The Third Circuit Court of Appeals explicitly rejected treating foster *parenting* as an exclusive public function in *Leshko v. Servis*, 423 F.3d 337, 341–47 (3d Cir. 2005). But in so doing, the court was not confronted with the specific question presented by the KidsPeace Defendants' and CSS Defendants' motions to dismiss: whether foster *placement* is an exclusively public function. As a result, M.B. argues that *Leshko* is distinguishable. Although M.B. is right that *Leshko*'s outcome is not strictly controlling, M.B. ignores three key ways in which *Leshko*'s analysis establishes that foster placement is not a public function and the KidsPeace Defendants' and CSS Defendants' roles do not fulfill a public function.

First, *Leshko* extensively discusses Pennsylvania's historic role in foster placement, showing that foster placement was not historically an exclusive prerogative of the Commonwealth. *Leshko* states that "in Pennsylvania, locating suitable foster homes and placing children in them traditionally was a function of private charitable organizations." *Id.* at 346.

> The Pennsylvania Society for the Prevention of Cruelty to Children, for example, regularly removed children from their homes in the late-1800s and placed them in institutions or with other families. Between 1880 and 1905, two organizations in Philadelphia, the Home Missionary Society of Philadelphia and the Children's Aid Society of Pennsylvania, placed some 5,400 children in foster homes.

*Id.* at 343 (citations omitted). In 1901, with Pennsylvania's passage of the Juvenile Act, the Commonwealth began "supervising the placement of children in foster care and regulating that care." *Id.* at 344 (emphasis added) (citing Act of May 21, 1901, P.L. 279 ("To regulate the treatment and control of dependent, neglected, and delinquent children . . . .")). According to at least some federal appellate caselaw, this involvement is not so longstanding or extensive as to render the public's role in foster placement "traditional" or "exclusive." *See Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 259–60 (2d Cir. 2008) (holding that care for the mentally ill was not "a function 'traditionally' and 'exclusively' reserved by the state" because "[t]he earliest movement toward complete state care did not come until the second half of the nineteenth century") (quotation and citation omitted).[15]

Second, *Leshko* shows that, even once the Commonwealth became involved in foster placement, Pennsylvania was not exclusively responsible for the function. Instead, Pennsylvania only *authorized* parents or guardians to enter into an agreement with *private organizations* incorporated in the Commonwealth "for the purpose of aiding, caring for or placing in homes such children, and being approved as herein provided, for the surrender of such child to such association

---

[15] The Court recognizes that one could argue (although M.B. does not) that Pennsylvania's involvement with foster placement—which has been ongoing for nearly 120 years, according to *Leshko*—should be construed as "traditional" for purposes of the public function test. But the Court is unaware of caselaw establishing or creating a framework for determining the exact point at which a state's participation in a function becomes so longstanding as to render it "traditional," aside from *Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 259–60 (2d Cir. 2008) (discussed *supra*). However, in a dissent, four justices on the United States Supreme Court agreed that "[t]he organization of interscholastic sports is neither a traditional nor an exclusive public function of the States" where the "[w]idespread organization and administration of interscholastic contests by schools did not begin until the 20th century." *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 309 (2001) (Thomas, J., dissenting) (conducting public function analysis while dissenting from decision that expressly did not apply public function test). Further still, *Leshko*'s analysis establishes that even once Pennsylvania did become involved in foster placement, foster placement was nonetheless not an *exclusive* public function, as is required under public function doctrine. *See infra* at pp. 27–28.

or institution, to be taken and cared for . . . or put into a friendly home." *Id.* at 346 (quoting Juvenile Act § 15). Indeed, in describing the Juvenile Act, *Leshko* commented that "statutory duties of even such early vintage are not traditionally governmental." *Id.* at 344–45 (citation omitted); *cf. Blum v. Yaretsky*, 457 U.S. 991, 1004–1005 (1982) ("Mere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the State responsible for those initiatives[.]"). The historical context provided in *Leshko* shows that, even once Pennsylvania began playing a role in foster placement, it did not exclusively provide foster placement services.

Third, in addition to conducting a broad historical analysis to determine whether foster care was traditionally in the exclusive province of Pennsylvania—an analysis that applies just as strongly to foster placement—*Leshko* also factually distinguishes foster care from other exclusive public functions. Most notably, *Leshko* highlights the differences between foster care and prison medical care, the latter of which the Supreme Court decided was an exclusive public function in *West v. Atkins*, 487 U.S. 42 (1988). In drawing the distinction, *Leshko* notes three key variances between foster care and prison medical care: (1) neither the federal nor Pennsylvania constitution requires that the state provide foster care, 423 F.3d at 344, (2) foster care is not "delivered in an institutional setting[,]" *id.* at 345–46, and (3) foster care is an "obligation" that is "comparatively new," compared to prison medical care. *Id.* at 346. All of the distinctions that *Leshko* draws between foster care and prison medical care are just as applicable when comparing foster placement with prison medical care: Foster placement is not constitutionally mandated, foster placement does not typically occur in an institutional setting, and in Pennsylvania, foster placement first saw public involvement at the same time as foster care. *See id.* at 343–46.

In trying to establish that foster placement is a public function, M.B. does not engage with the "[h]istorical practice" of foster placement or the "state statutory scheme,"[16] *Sullivan*, 526 U.S. at 56, and she therefore cannot carry her burden. Instead, M.B. makes two arguments in support of her position, neither of which is persuasive.

First, M.B. argues that because KidsPeace and CSS contracted with and derived their authority from state or quasi-state agencies, the private organizations "would and could not have placed J.W. in M.B.'s home" absent their exercise of "traditionally government functions." *See* Doc. No. 52-1 at p. 18; *see also* Doc. No. 51-1 at p. 15 (stating that CSS drew its authority from its contracts with state or quasi-state agencies). But this presumes, without establishing, the underlying premise that any organization involved with foster placement was engaging in a traditionally exclusive public function, a premise already discussed and dispelled.

---

[16] Aside from its historical analysis, *Leshko* does not closely scrutinize the current Pennsylvania administrative scheme relevant to foster placement. Instead, the *Leshko* court merely acknowledged that *today* "removing children from their homes and placing them with other caregivers *arguably* are exclusively governmental functions in Pennsylvania." *Leshko*, 423 F.3d at 343 (emphasis added). This does not change the foregoing analysis for two reasons. First, it does not diminish the fact that *historically* foster placement in Pennsylvania was not an exclusively public function. And second, the Court today notes that the relevant Pennsylvania administrative provisions suggest that foster placement continues to involve private *and* public actors, rather than exclusively public agencies. For example, the State Administrative Code chapter on Foster Family Care Agencies applies to any "agency operated by a person, organization, corporation or society, *public or private*, for profit or not-for-profit, which approves or supervises foster families or provides foster family care." 55 Pa. Code § 3700.1 (emphasis added); *see also* 55 Pa. Code § 3700.4 ("Foster family care agency or FFCA--A public or private agency which recruits, approves, supervises and places children with foster families."). Neither M.B. nor the KidsPeace Defendants and CSS Defendants discuss what effect, if any, the current administrative scheme has on whether foster placement is or is not an exclusively public function. But the Administrative Code expressly contemplates that both public and private entities may participate in foster placement. *Id.* As such, the Commonwealth's "[m]ere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the State responsible for those initiatives[.]" *Blum v. Yaretsky*, 457 U.S. 991, 1004–05 (1982).

Second, M.B. asserts that this case is more like a handful of contrary district court cases[17] than it is like *Leshko*.  Although M.B. is correct that the facts of those district court cases are more apposite than the facts of *Leshko* (because the at-issue public function related to foster placement and not foster care), M.B. overlooks that none of the district court cases conduct the necessary historical analysis to determine whether foster placement was traditionally "an exclusively governmental function."  *Leshko*, 423 F.3d at 344; *see also Leshko*, 423 F.3d at 343 n.4 ("Following the example of the Supreme Court, we look to the historical practice of the state at issue" to conduct the public function analysis.).  Indeed, all but one of the cases on which M.B. relies predate *Leshko* and consequently did not have the benefit of *Leshko*'s thorough historical examination.  The only case cited by M.B. that actually addresses *Leshko*, namely *Barron v. Washington Cty. Children & Youth Soc. Serv. Agency*, No. 05-1517, 2006 WL 931678 (W.D. Pa. Apr. 11, 2006), does not do so in depth.  *Barron* primarily distinguishes *Leshko*'s public function analysis on the facts:[18]

> The *Leshko* Court based its decision in large part on the fact that providing foster care was not traditionally 'an exclusive public function of the state,' but rather an activity which had long been shared by private charitable institutions and individuals.  Here, the activity in question is not providing the day-to-day care that foster parents offer, but rather supervision of foster parents in those cases where the child has been removed from his home by state action.

*Id.* at *4.

But in so doing, *Barron* fails to acknowledge that the historical context provided in *Leshko* establishes that foster placement, like foster care, has "long been shared by private charitable

---

[17]    *See Barron v. Washington Cty. Children & Youth Soc. Serv. Agency*, No. 05-1517, 2006 WL 931678, *4–6 (W.D. Pa. Apr. 11, 2006); *Harris ex rel. Litz v. Lehigh Cty. Office of Children & Youth Servs.*, 418 F. Supp. 2d 643, 650 (E.D. Pa. 2005); *Estate of Adam Earp v. City of Philadelphia*, No. 96-7141, 1997 WL 255506, at *2 (E.D. Pa. May 7, 1997).

[18]    *Barron* also distinguishes other portions of *Leshko* that are unrelated to the public function test; that analysis is inapplicable here.

institutions and individuals." *Id.*; *see Leshko*, 423 F.3d at 343 ("Organized placement of children in foster homes began in late-19th century Pennsylvania as a service of private societies to protect children from cruelty."). *Barron* ignores that (1) *Leshko*'s historical analysis is not limited to foster care, and (2) *Leshko*'s description of the traditional practice of foster placement affirms that foster placement is not a public function.

Although *Leshko*'s holding is limited to foster case, its analysis nevertheless applies to foster placement. And because that analysis demonstrates that foster placement was not traditionally the exclusive prerogative of the State, M.B. cannot use the public function test to support its § 1983 claims against the non-state actor KidsPeace Defendants and CSS Defendants.

The Court will dismiss, without prejudice, the § 1983 claims against the KidsPeace Defendants and CSS Defendants.[19]

## III. Whether the Amended Complaint States a Claim for Vicarious Liability and Direct Negligence Against the CSS Defendants[20]

The familiar elements of negligence under Pennsylvania law are "a duty, a breach of that duty, a causal relationship between the breach and the resulting injury and an actual loss." *Burman v. Golay & Co.*, 616 A.2d 657, 659 (Pa. Super. 1992). The CSS Defendants argue that they did not owe any duty to M.B. and that the Amended Complaint generally lacks allegations sufficient to state a claim against the CSS Defendants for negligence. The Court will dismiss the negligence and vicarious liability claims against the CSS Defendants.

---

[19]    Although further amendments regarding the public function test would be futile, M.B. has not attempted to allege or argue whether the close nexus test, symbiotic relationship test, or entwinement test might support liability against the KidsPeace Defendants and CSS Defendants.

[20]    The Court dismisses the federal claims against the KidsPeace Defendants and the CSS Defendants, but because the Court denied the request to dismiss the federal claims against the Schuylkill County Defendants, the Court has supplemental jurisdiction over the remaining state claims pursuant to 28 U.S. Code § 1367(a).

First, to determine whether the CSS Defendants owed M.B. a duty, the Court must look to whether the CSS Defendants had a "relationship" pursuant to which they owed an "obligation for the benefit of [M.B.]" *Hoffman v. Sun Pipe Line Co.*, 575 A.2d 122, 125 (Pa. Super. Ct. 1990) (citations and quotations omitted). If the CSS Defendants did not owe any obligation to M.B., and instead they were "strangers to each other," then the CSS Defendants owed only "the general duty imposed on all persons not to place others at risk of harm through their actions." *Id.* (citation omitted).

> "The scope of this [general] duty is limited, however, to those risks which are reasonably foreseeable by the actor in the circumstances of the case. Only when the question of foreseeability is undeniably clear may a court rule as a matter of law that a particular defendant did not have a duty to a particular plaintiff."

*Id.* (citations omitted).

The allegations in the Amended Complaint establish that the CSS Defendants were not under any obligation to M.B., and so they owed her only the general duty owed to all persons. According to the Amended Complaint, there was only one interaction between the CSS Defendants and M.B., which occurred when CSS employee Geneva Mathuse went to M.B.'s home "to meet *with J.W.*," Amended Compl. ¶ 47 (emphasis added), and at that time commented to K.B. and P.B. that the placement was surprising because "J.W. was not to be placed in homes with younger children." *Id.* Nothing in the Amended Complaint establishes or suggests that the CSS Defendants had any relationship with M.B. or were responsible for placing J.W. in M.B.'s home; instead the Amended Complaint reflects that when Ms. Mathuse was at M.B.'s home, it was because of Ms. Mathuse's obligation to J.W. *Id.*

Even though the CSS Defendants did not owe M.B. a special duty, however, the CSS Defendants were still subject to "the general duty imposed on all persons not to place others at risk of harm through their actions." *Hoffman*, 575 A.2d at 125–26 (citation omitted). And that general

duty included the duty to address "risks which [we]re reasonably foreseeable" to the CSS Defendants. *Id.* Based on Ms. Mathuse's own statements, it is clear that she—and by implication CSS—was aware that J.W. posed a risk to other children. The CSS Defendants (1) knew that J.W. was "not to be placed in homes with younger children," and (2) had been placed in a home with younger children, including M.B. Amended Compl. ¶ 47. As a result, even the CSS Defendants' "general duty" encompassed the reasonably foreseeable harm to other children in J.W.'s foster home.

In addition to arguing that the CSS Defendants did not owe M.B. any duty, the CSS Defendants also assert that the negligence and vicarious liability claims lack the requisite specificity to satisfy Federal Rule 8. As noted above, *see supra* at pp. 9–10 & n.5, although the Amended Complaint as a whole includes facts sufficient to avoid dismissal as a shotgun pleading, the specific allegations must still exceed general "labels," "conclusions," or "formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. The CSS Defendants contend specifically that M.B. "avers numerous instances of conduct by 'Defendants,' without clarifying which Defendant or Defendants is or are responsible for any given conduct." Doc. No. 47 at p. 14.

The Court agrees with the CSS Defendants that the Amended Complaint does not include any specific allegations of conduct *by the CSS Defendants* sufficient to state a claim for negligence. The only action allegedly taken by CSS or its employee Ms. Mathuse was Ms. Mathuse's decision not to remove J.W. from M.B.'s home. *See* Amended Compl. ¶ 47.[21] This nonfeasance, i.e., "the

---

[21]     The Amended Complaint states that "[neither] Defendant Mathuse nor CSS took any action to remove J.W. from the Minor-Plaintiff's home or to seek his removal. Upon information and belief, Defendant Mathuse did not remove J.W. personally nor did she contact [Schuylkill County], KidsPeace, the authorities or anyone to have J.W. immediately removed." Amended Compl. ¶ 47.

omission of an act which a person ought to do," is insufficient to support a claim under Pennsylvania law. *See Brindley v. Woodland Vill. Rest., Inc.*, 652 A.2d 865, 869 (Pa. Super. Ct. 1995) ("[A] corporate officer can be held liable for 'misfeasance,' i.e., the improper performance of an act, but not for 'mere nonfeasance,' i.e., the omission of an act which a person ought to do.") (citing *Wicks v. Milzoco Builders, Inc.*, 470 A.2d 86, 90 (Pa. 1983)). This participation theory of liability—that employees are liable only for action but not inaction—applies to the liability of corporate officers as well as other employees. *See Aldorasi v. Crossroads Hosp. & Mgmt. Co., LLC*, 344 F. Supp. 3d 814, 822–23 (E.D. Pa. 2018) (collecting cases for proposition that "Pennsylvania courts have routinely applied the [participation] theory to employees and other non-officer agents"). Because no employee from CSS participated in the initial placement of J.W. (or any other alleged misfeasance), the negligence and vicarious liability claims against the CSS Defendants fail.[22]

The Court will dismiss the negligence and vicarious liability claims against the CSS Defendants.

## IV. Whether the Amended Complaint States a Claim for Negligent Misrepresentation Against the KidsPeace Defendants

Under Pennsylvania law, a plaintiff alleging negligent misrepresentation must establish: "(1) a misrepresentation of a material fact; (2) made under circumstances in which the misrepresenter ought to have known its falsity; (3) with an intent to induce another to act on it;

---

[22] A corporation can only be held liable on a vicarious liability theory based on the *actions* of its employees. *See*. *R.A. ex rel. N.A. v. First Church of Christ*, 748 A.2d 692, 699 (Pa. Super. Ct. 2000) ("It is well settled that an employer is held vicariously liable for the negligent acts of his employee which cause injuries to a third party, provided that such acts were committed during the course of and within the scope of the employment.") (citation omitted). Because the Amended Complaint does not allege that any employee of CSS took acts sufficient to generate liability, the claim for vicarious liability fails.

and (4) which results in injury to a party acting in justifiable reliance on the misrepresentation." *Bilt–Rite Contractors, Inc. v. The Architectural Studio*, 866 A.2d 270, 277 (Pa. 2005) (citation omitted). The KidsPeace Defendants make three arguments that M.B.'s claim for negligent misrepresentation fails, none of which are persuasive.

First, the KidsPeace Defendants argue that there are no "plausible" allegations that they had "knowledge of a danger[.]" Doc. No. 48-1 at p. 20. This appears to be an attempt by the KidsPeace Defendants to argue that they did not misrepresent J.W.'s history and the safety of placing J.W. in M.B.'s home. But this argument overlooks that the KidsPeace Defendants allegedly knew (or had in their possession) the following information when KidsPeace employee Cori Ruszkowski spoke with K.B. and P.B.: (1) at a prior foster home, J.W. asked another child to have sex with him, Amended Compl. ¶ 44, (2) J.W. was not allowed to be in the same foster home as his biological siblings because he told them to "do bad things," *id.* ¶ 45, and (3) J.W. alleged that he had previously been abused, *id.* ¶ 42. This information all contradicts Ms. Ruszkowski's alleged statement to K.B. and P.B. that J.W. had no "sexual assault, molestation or troubling behavioral history." *Id.* ¶ 37.

Second, the KidsPeace Defendants argue that they are not liable for any misrepresentation because K.B. and P.B. found out about J.W.'s history prior to his alleged assault of M.B. *See* Doc. No. 48-1 at 20–21. The KidsPeace Defendants do not state, however, what legal significance this fact has, if any. To the extent that this is a half-hearted attempt by the KidsPeace Defendants to challenge causation, M.B. has adequately alleged both factual and proximate causation. The Amended Complaint states in several points that K.B. and P.B. would not have fostered J.W. absent the representations from the KidsPeace Defendants that J.W. posed no risk to K.B. and P.B.'s children, *see* Amended Compl. ¶¶ 33–34, establishing factual causation. And the KidsPeace

Defendants' alleged misrepresentations were similarly a proximate cause of, or "substantial factor in bringing about," the harm to M.B. *Flickinger's Estate v. Ritsky*, 74, 305 A.2d 40, 43 (Pa. 1973) (adopting "substantial factor" test for proximate causation).

Third, the KidsPeace Defendants argue that M.B. did not detrimentally rely on any alleged misrepresentation. As M.B. acknowledges, the Amended Complaint does not allege that M.B. relied on any misrepresentation made by the KidsPeace Defendants. Instead, M.B.'s theory is that "M.B.'s *parents* relied on the inaccurate information provided by the Kids[P]eace Defendants[.]" Doc. No. 52-1 at p. 29 (emphasis added). It does not matter, M.B. argues, that her parents relied on the KidsPeace Defendants' representations. In support, she cites *Frantz v. Nationwide Ins. Co.*, No. 18-0509, 2018 WL 4207742 (M.D. Pa. Sept. 4, 2018), a case brought by a parent in his individual capacity and as a guardian and parent of his minor child. Although the court in *Frantz* refused to dismiss a negligent misrepresentation claim, the court conducted no analysis of the reliance element. *See id.* at *4. Nonetheless, the Court is persuaded that because Pennsylvania has embraced § 311 of the Restatement (Second) of Torts, M.B. is correct that her parents' reliance can support M.B.'s cause of action for negligent misrepresentation. Section 311 states:

(1) One who negligently gives false information to another is subject to liability for physical harm caused by action taken by the other in reasonable reliance upon such information, where such harm results

    (a) to the other, or

    (b) *to such third persons as the actor should expect to be put in peril by the action taken*.

*English v. Lehigh Cty. Auth.*, 428 A.2d 1343, 1356 (Pa. Super. 1981) (quoting Restatement (Second) of Torts § 311) (emphasis added).

Here, M.B. is a "third person" as contemplated by § 311(1)(b). The KidsPeace Defendants allegedly made a misrepresentation that was relied on by K.B. and P.B., Amended Compl. ¶¶ 33–

35, 37, and the KidsPeace Defendants should have expected that K.B.'s and P.B.'s children would be put in peril by the misrepresentation, given that the misrepresentation allegedly related to whether J.W. was a danger to other foster children. *See White v. Kennedy Krieger Inst., Inc.*, 110 A.3d 724, 747–50 (Md. 2015) (stating that "§ 311 establishes that an actor may be liable in tort to a third party who neither hears, nor directly relies on any misrepresentation by the actor" and concluding that "requiring direct, personal reliance of [an] infant would constitute an unreasonable bar to the infant from recovery for tortious negligent misrepresentations made to their parents who gave informed consent on their behalf").

The Court will deny the KidsPeace Defendants' motion insofar as it relates to the claim against them for negligent misrepresentation.

## V. Whether the Amended Complaint States a Claim for Negligence *Per Se* Against the KidsPeace Defendants

Negligence *per se* consists of four elements under Pennsylvania law: (1) the purpose of the statute must be, at least in part, to protect the interest of the plaintiff individually, as opposed to the public, (2) the statute or regulation must clearly apply to the conduct of the defendant, (3) the defendant must violate the statute or regulation, and (4) the violation of the statute must proximately cause the plaintiff's injuries. *Jordan v. City of Philadelphia*, 66 F. Supp. 2d 638, 644 (E.D. Pa.1999). The KidsPeace Defendants focus on the first prong, arguing that M.B.'s claim for negligence *per se*, for violation of 55 Pa. Code § 3700, *et seq.*, fails because the at-issue provisions are designed to protect foster children, rather than foster families. This argument is unpersuasive, however.

The KidsPeace Defendants emphasize that § 3700.38(c)—"Orientation and information for foster families"—specifically makes reference to protecting the health of foster children, but here M.B. is not suing to protect the interest of a foster child. *See* § 3700.38(c) ("Foster families shall

be provided information from the case record which is necessary to protect the child's health and safety and to assist in the child's successful accomplishment of necessary educational, developmental or remedial tasks.")  The KidsPeace Defendants also highlight the administrative provisions' stated goals, which are:

> [*T*]*o reduce risk to children in placement; to protect their health*, safety and human rights; to establish minimum requirements for the operation of a foster family care agency; and to establish minimum requirements to be applied by foster family care agencies when *approving and supervising foster families*.

55 Pa. Code § 3700.2 (emphasis added).

M.B. emphasizes that § 3700.2 expressly discusses protecting the health of foster children, and not foster families.  Indeed, in highlighting certain portions of the goals, the KidsPeace Defendants overlook the last clause of § 3700.2, which specifically relates to "approving and supervising foster families."  *Id.*; *see also supra* at pp. 23–24 (discussing Pennsylvania's administrative disclosure requirements).  Similarly, § 3700.38(d) provides that "[f]oster families shall be provided information from the case record which will enable them to function safely and in cooperation with the [Foster Family Care Agency]."  Both the goals of § 3700 and the specific provisions relating to foster families, therefore, are not as limited as the KidsPeace Defendants argue; "at least in part," § 3700 protects foster families, including M.B.  *Jordan*, 66 F. Supp. 2d at 644.

The Court will deny the KidsPeace Defendants' request to dismiss the claim for negligence *per se*.

## CONCLUSION

For the foregoing reasons, the motions to dismiss are resolved as follows:

The Court grants in part the Schuylkill County Defendants' motion such that the punitive damages claim against Ms. Hoke in her official capacity only is dismissed with prejudice.  The

Court denies (1) the Schuylkill County Defendants' request to dismiss the state-created danger claim against Marcia Hoke, (2) the Schuylkill County Defendants' request to dismiss the *Monell* claim against Schuylkill County, (3) the Schuylkill County Defendants' request to dismiss the § 1983 claim against Ms. Hoke based on qualified immunity, and (4) the Schuylkill County Defendants' request to dismiss the punitive damages claim against Ms. Hoke in her individual capacity.

The Court grants the CSS Defendants' motion in its entirety, such that (1) the § 1983 claims against all of the CSS Defendants are dismissed without prejudice, and (2) the negligence and vicarious liability claims against all of the CSS Defendants are dismissed without prejudice. Because no other claims remain against the CSS Defendants, they shall be dismissed from this action unless M.B. seeks leave to amend.

The Court grants in part the KidsPeace Defendants' motion, such that the § 1983 claims against all of the KidsPeace Defendants are dismissed without prejudice. The Court denies the KidsPeace Defendants' requests to dismiss the claims for negligent misrepresentation and negligence *per se*.[23]

An appropriate order follows.

BY THE COURT:

  /s/ Gene E.K. Pratter
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE

---

[23]     The following claims remain:

Against the Schuylkill County Defendants: § 1983 (Count I); and

Against the KidsPeace Defendants: Vicarious Liability and Direct Negligence (Count III), Negligent Misrepresentation (Count IV), Negligent Performance of Undertaking to Render Services (Count V), and Negligence *Per Se* (Count VI).